UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| THOMAS REILLY, | CIVIL ACTION NO.: |
| Plaintiff | 302CV1346 (SRU) |
| v. | |
| CITY OF WEST HAVEN and H. RICHARD BORER, JR. | |
| Defendants | July 1, 2004 |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

### I.  PRELIMINARY STATEMENT

The defendants, City of West Haven ("West Haven") and H. Richard Borer, Jr. ("Mayor Borer") have filed a motion for summary judgment under Fed. R. Civ. P. 56 to dismiss Thomas Reilly's claims in its entirety, contending that: (1) the City is not subject to Section 1983 or Conn. Gen. Stat § 31-51q claims because Mayor Borer is not a final policymaker with respect to the City's budget; (2) Mayor Borer is not liable under Section 1983 or Conn. Gen. Stat. § 31-51q in his individual capacity. The plaintiff has decided to withdraw his individual claims under § 1983 against Mayor Borer. For the reasons discussed below, however, the remainder of the defendants' motion should be denied and the plaintiff should be allowed to present his case to a jury. In particular, there is a material question of fact as to whether the City of West Haven's City Council ratified Mayor Borer's unlawful retaliation against the plaintiff because he ran in the 2001 Democratic Primary for City Council on the ticket for against the ticket headed by Mayor Borer.

### II.  FACTS

Mr. Reilly began working for the City of West Haven in 1995 as an Electrical Inspector. In or around August 2001, Mr. Reilly ran for a Democratic Council

1

seat. Mr. Reilly ran on the same ticket as Democrat, John Picard, who was running for Mayor in the 2001 primary election against the current Mayor H. Richard Borer, Jr. (Complaint ¶ 7).

On September 11, 2001, Mr. Reilly lost in the Democratic primary election. (Complaint ¶ 8). In October 2001, prior to the general election, Mayor Borer told State Representative Louis Esposito, along with several other people, that if he (Mayor Borer) was reelected "Tom Reilly is out." (Complaint ¶ 9). In November 2001, Mayor Borer was reelected. (Complaint ¶ 10).

In January 2002, Mayor Borer removed Mr. Reilly from the Holiday Festivities Committee. (Complaint ¶ 11). In or around March 2002, Mayor Borer submitted to the City Council his proposed budget for 2002-03. The defendant's Planning and Development Department had 12 employees, which included six (6) inspectors. Mayor Borer's Budget recommended eliminating the plaintiff's Electrical Inspector position. (Complaint ¶ 12).

On April 11, 2002, the West Haven Voice's *Dear Felicia* article indicated that Mayor Borer promised to get rid of Mr. Reilly and the City of West Haven's Risk Manager, Sandra Lorusso, for being on the "wrong team." (Complaint ¶ 13).

Sandra Lorusso was Mayor Borer's personal secretary from 1991-1998. In 1998, Ms. Lorusso was promoted to Risk Manager in the Financial Department. Ms. Lorusso supported John Picard in the 2001 primary election. Mayor Borer also cut her position from the 2002-2003 budget. (Complaint ¶ 14).

In our around April 2002, Ralph DeLucca, Mayor Borer's Personal Director, informed Ms. Lorusso and Mr. Reilly that Mayor Borer thought they were conspiring against him because he saw them talking in Ms. Lorusso's office. (Complaint ¶ 15).

On or around April 14, 2002, Mr. Reilly wrote a letter to each City Council member requesting that they put his job as Electrical Inspector back into the budget. Mr. Reilly's letter explained that reinstating his position would actually save the City of West Haven eight hundred dollars ($800.00) because the City intended to hire an Assistant Building Inspector for $800.00 more than Mr. Reilly's salary. The Assistant Building Inspector's job consisted of essentially the same tasks already performed by Mr. Reilly. Under the City of West Haven's City Charter, at least nine (9) of the City Council

members had to agree if they wished to override anything in the Mayor's budget proposal. Before the City Council voted on the 2002-03 budget, Mr. Reilly told City Council Members Anna Cirillo and Joseph Cullen that he believed that Mayor Borer voted to eliminate his Electrical Inspector position from the Budget to retaliate against him because he ran on the ticket opposing the Mayor in the 2001 Democratic Primary. Seven Council members voted to put Mr. Reilly's position back in the budget but four still voted to eliminate his position. The only City Council members who endorsed Mayor Borer's proposal to eliminate Mr. Reilly's position ran on 2001 Democratic ticket along with Mayor Borer. (Complaint ¶ 16).

In or around May 2002, Commissioner of Planning and Zoning, James Hill, informed Mr. Reilly that he could not oppose Mayor Borer's proposal to cut Mr. Reilly's position from the budget because Mayor Borer had warned Mr. Hill not to challenge his proposal because Mr. Hill's job was expendable as well. (Complaint ¶ 17).

On May 2, 2002, Mayor Borer's budget was adopted. That same day, Deborah Evangelista, Administrator from the Registrar's Office and Sandra Lorusso's sister, had her hours reduced from a full-time position to nineteen (19) hours per week. According to the defendant's policies related to health benefits, an employee could not receive health care benefits if they worked less than twenty (20) hours a week. Ms. Evangelista told Mayor Borer that his actions were nothing more than political payback. Mayor Borer responded "and you're living proof of it." (Complaint ¶ 18).

On July 1, 2002, Mr. Reilly's position was eliminated. By the terms of his contract he was able to "bump" into a lateral or lower classification position. However, the defendant repeatedly altered the requirements of every position Mr. Reilly sought in order for him not to qualify. For example, Mr. Reilly applied for the positions of Highway Maintenance Superintendent, Assistant to the Commissioner of Public Works and Risk/Procurement Manager. Although Mr. Reilly was qualified for these positions and they paid a lower hourly rate than Electrical Inspector, his applications were still rejected. (Complaint ¶ 19).

Mr. Reilly eventually agreed to bump into the only position for which the defendant claimed he was qualified, which was the Property Maintenance Code

Inspector. Mr. Reilly started in the new position on July 1, 2002. The new position was a demotion and forced him to accept a substantial pay cut. (Complaint ¶ 20).

## III. STANDARD OF REVIEW

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P 56(c).

A court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only where 'no reasonable trier of fact could find in favor of the nonmoving party.'" Allen v. Coughlin, 64 F.3d 77,79 (2d Cir. 1995) (citation omitted) According to the Second Circuit, a court may only grant summary judgment "if it appears beyond doubt that the plaintiff can prove no set of facts in support of [his] claim which would entitle [him] to relief." Terry v. Ashcroft 336 F.3d 128, 137 (2d Cir. 2003) (citation omitted). The motion for summary judgment should be denied when the "record takes as a whole …lead a rational trier of fact to find" for the nonmoving party. Mack v. Otis Elevator Co, 326 F.3d 116, 123 (2d Cir. 2003).

On a motion for summary judgment, "[a]s a general rule, all ambiguities and references to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." Collins v. Christopher, 48 F. Supp. 2d 397, 401 (S.D.N.Y. 1999) (citing Brandy v. Town of Colchester, 863 F.2d 205, 210 (2d Cir. 1988). "When reasonable persons, applying the proper legal standards, could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury." Richardson v. Metropolitan District Commission, 2003 WL 21727781, *3 (D. Conn. 2003).

Summary judgment is not proper in the present case because there are material issues of fact in dispute that warrant a denial of summary judgment.

## VI. LEGAL ARGUMENT

### A. THERE IS A QUESTION OF FACT AS TO WHETHER THE CITY COUNCIL RATIFIED MAYOR BORER'S DECISION AND

4

## RETALIATED AGAINST THE PLAINTIFF BY ELIMINATING HIS POSITION FROM THE BUDGET.

A municipality may be held liable under 42 U.S.C. § 1983 if the conduct that caused the unconstitutional deprivation was undertaken pursuant to: (1) a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers, (2) governmental "custom even though such a custom has not received formal approval through the body's official decision-making channels," or (3) the actions of officials who have final policy making authority. Jeffes v. Barnes, 208 F.3d 49, 57-58 (2d Cir. 2000).

The Defendant claims that the Mayor can use the budget as a tool to retaliate, threaten or intimidate his employees so long as the City Council, and not the Mayor, approves the budget. See Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. Mem. Of Law") at 4-9. The defendant would like this court to think its argument is simple and straightforward: the City Council is the final policymaker for purposes of the budget and, therefore, even if the plaintiff's retaliatory claims "are supported by credible evidence" the City and Mayor Borer are not liable pursuant to § 1983. Def. Mem. Of Law at 5.

The Defendants neither addressed nor distinguished Judge Hall's recent decision in Richardson v. Metropolitan District Commission, 2003 WL 21727781, at *7 (D. Conn. 2003)(annexed as Exhibit 1), refusing to allow Defendants to escape liability under § 1983 because the Board of Commissioners ("Board") had final policymaking authority. The defendant, Metropolitan District Commission ("MDC") moved for summary judgment in the plaintiff's sex discrimination claim, contending that, because the Board was the final policymaker "and because all personnel policy must be authorized by the board, MDC [could] not be held liable for the individual actions of any named defendants." Id. In rejecting MDC's argument, Judge Hall stated, '[d]espite the defendant's argument...MDC may nonetheless be liable if the board ratified the discriminatory conduct and the discriminatorily-based personnel recommendations of these individuals." Id.

The plaintiff in Richardson was continuously harassed and belittled by her supervisor, who often referred to her as a "bitch" and repeatedly threatened to fire her.

The plaintiff was also passed over for merit pay increases as a result of her complaints to the human resource department regarding her supervisor. As in this case, the defendants in Richardson attempted to convince the court that, despite the alleged unlawful behavior of the plaintiff's supervisor, the Board was the final policymaker and, therefore, MDC was shielded from liability. Id. at *7. Judge Hall concluded that the Board was indeed the final policymaker for purposes of § 1983 liability. However, her inquiry did not stop there. Judge Hall held that there was a "material issue of fact as to whether the adverse employment action…were based on [the supervisor's] discriminatorily-based recommendations, and whether the board knew of this basis, but nonetheless ratified his recommendations." Richardson 2003 WL 21727781 *8 (citing City of St. Louis v. Paprotnik, 485 U.S. at 127).

In Richardson, the court explained that a policymaker's acquiescence to the actions of his subordinates may amount to a policy or custom, if the subordinate's "discriminatory practice [is] so manifest as to imply the constructive acquiescence of serious policy-making officials." Richardson, 2003 WL 21727781 *19 (quoting Wimmer v. Suffolk County Police Dept, 176 F.3d 125, 137 (2d Cir. 1999)(internal citation omitted). Judge Hall elaborated that "[w]hen a subordinate's decision is subject to review by the municipality's authorized policymakers 'their ratification would be chargeable to the municipality because their decision is final." Richardson, 2003 WL 21727781 *19 (quoting City of St. Louis v. Praprotnik, 485 U.S. 112 (1988)).

In the present case, Mayor Borer concocted a scheme to retaliate against Mr. Reilly for opposing him in the Mayoral election. Mayor Borer used the City Council budgetary process to try to shield himself from liability. However, the real question before this court is *not* whether Mayor Borer is the final policymaker for purposes of § 1983 liability but whether the City Council knew of Mayor Borer's retaliatory-based recommendation and, if so, still ratified his recommendation. Def. Mem. of Law at 4.

Although Mayor Borer is trying to hide behind the City Council to escape liability for his unlawful retaliation, Mayor Borer did not try to hide his vendetta against Thomas Reilly. Before the November, 2001 general election, Mayor Borer, for example, told State Representative Louis Esposito, along with several other people, that if he (Mayor Borer) was reelected "Tom Reilly is out." Complaint ¶ 9. Shortly after Mayor Borer was

6

reelected, he carried out his threat by proposing that Mr. Reilly's Electrical Inspector position be eliminated. Complaint ¶ 12. It was not a surprise when <u>West Haven's Voice's</u> *Dear Felicia* April 11, 2002 article stated that Mayor Borer promised to get rid of Mr. Reilly for being on the "wrong team." Complaint ¶ 13. Before the 2002-03 budget was adopted by the City Council, Mr. Reilly wrote a letter to each City Council member requesting that they put his job as Electrical Inspector back into the budget. Complaint ¶ 16. Mr. Reilly explained that reinstating his position would actually save money for the City. Complaint ¶ 16.

In his letter dated April 14, 2002 to the City Council Chairman James Morrissey requesting that his position as Electrical Inspector be put back in the budget, Mr. Reilly stated that "[t]here were rumors in the papers, friends and others all saying that the Mayor was going to eliminate my position. The Mayor told people he would eliminate my position, but to see it in print brings many emotions to the surface." (Exhibit 2). Mr. Reilly also noted in his April 14, 2002 letter that in January 2002 he had been already removed by the Mayor's office from volunteering for and chairing events such as the Fireworks, Savin Rock Festival and Holiday Festivities. In response to his letter, City Council Member Anne Cirillo contacted him by telephone. (Exhibit 3, Reilly Deposition Transcript ("Dep. Tr.") at 78-79). During their conversation, Mr. Reilly told Ms. Cirillo that he believed that the only reason Mayor Borer had recommended that his position as Electrical Inspector be eliminated was because of "political payback" because he ran for City Council in the 2001 Democratic Primary against the ticket headed by Mayor Borer. (Exhibit 4, Reilly Affidavit ¶ 9). During their telephone conversation, Ms. Cirillo told Mr. Reilly that she was getting a lot of "flack" at the time from other political parties if she supported Mr. Reilly. (Exhibit 3, Reilly Dep. Tr. at 78).

In response to his April 14, 2002 letter, Mr. Reilly also met with City Council member Joseph Cullen (Exhibit 3, Reilly Dep. Tr. at 79). During their meeting, Mr. Reilly also told Mr. Cullen that he believed that Mayor Borer recommended that his position as Electrical Inspector be eliminated from the 2002 Budget to retaliate against him because he ran on the John Picard's ticket against Mayor Borer's ticket in the 2001 Democratic Party Primary. (Exhibit 4, Reilly Affidavit ¶ 10).

7

Despite its knowledge that "political payback" may have been the catalyst for the elimination of Mr. Reilly's position as Electrical Inspector, the City Council still endorsed Mayor Borer's recommendation to eliminate the position. (See Exhibit 5, New Haven Registrar, noting that "[t]he council did not restore other controversial cuts that Borer critics charged had political overtones. Those included jobs held by Risk Manager Sandra Lorusso and Electrical Inspector Thomas Reilly…"). Under the City of West Haven's Charter, at least nine (9) of the City Council members had to agree to override a recommendation in the Mayor's Budget. West Haven, Conn., City charter ch. XIX, pt. A § 4 (1961, as revised). Seven (7) City Council Members voted to reinstate Mr. Reilly's Electrical Inspector position to the budget while four (4) voted to eliminate his position. Complaint ¶ 16. The four (4) City Council members who voted to endorse Mayor Borer's proposal to eliminate Mr. Reilly's position ran on the 2001 Democratic ticket along with Mayor Borer. Complaint ¶ 16.

In Richardson, the court denied summary judgment because there was a material issue of fact as to whether the board knew of the complaint lodged against [plaintiff's supervisor] and whether the board ratified [plaintiff's supervisor's] conduct…." Richardson, 2003 WL 21727781 *8. Similarly, there is a question of fact as to whether the City Council: (1) knew about Mr. Reilly's claim that his position was eliminated to retaliate against him because he ran on the ticket opposing Mayor Borer's ticket in West Haven's 2001 Democratic Primary, and (2) despite that knowledge, ratified Mayor Borer's conduct.

Because Mr. Reilly directly told two City Council members that he believed Mayor Borer eliminated his position to retaliate against him because he ran against Mayor Borer's ticket in the 2001 Democratic Primary and the City Council still eliminated his position, there is a question of fact as to whether the City Council (1) knew that Mr. Reilly believed that Mayor Borer recommended that his position be eliminated to retaliate against him, and (2) ratified Mayor Borer's conduct despite that knowledge. However, there is also additional evidence that the City Council knew that Mayor Borer's recommendation to eliminate plaintiff's position was merely to get even with Mr. Reilly and ratified it anyway because: (1) in his April 14, 2002 letter to City Council Chairman Morrinssey pleading to restore his position to the budget, Mr. Reilly acknowledge there

8

were rumors that Mayor Borer was going to eliminate his position, (2) Mayor Borer told State Representative Louis Esposito and several other people in October 2002 that if he, Mayor Borer, was reelected "Tom Reilly is out," (3) a weekly newspaper called the <u>West Haven Voice</u> stated that Mayor Borer had said he would get rid of plaintiff and West Haven's Risk Manager Sandy Larusso, for being on the "wrong team" (Ms. Larusso's position was also cut from the 2002-03 budget[1]), (4) City Council Member Anna Cirillo said she was getting "flak" because she was considering voting in favor of reinstating Mr. Reilly's position to the 2002-03 budget, and (5) Mayor Borer warned James Hill, the Commissioner of Planning and Zoning, not to challenge Mayor Borer's proposal to cut Mr. Reilly's position because Mr. Hill's job was "expendable as well." Complaint ¶ 17.

### (a) There is a question of fact as to whether the defendants retaliated against plaintiff by removing him from committees and obstructing his job search.

Mr. Reilly's allegations of retaliation were not limited to the elimination of his position as Electrical Inspector. After his position was eliminated on July 1, 2002, Mr. Reilly could "bump" into a lateral and lower classification position. Complaint ¶ 19. However, the defendant repeatedly altered the requirements of every position Mr. Reilly sought in order to disqualify him. Complaint ¶ 19. For example, Mr. Reilly applied for the positions of Highway Maintenance Superintendent, Assistant to the Commissioner of Public Works and Risk/Procurement Manager. Complaint ¶ 19. Although Mr. Reilly was qualified for these positions and they paid a lower hourly rate than Electrical Inspector, his applications were still rejected. Complaint ¶ 19.

Mr. Reilly also claims that Mayor Borer retaliated against him by removing him from Committees dealing with Fireworks, the Savin Rock Festival and the Holiday Festival (Exhibit 2). In his April 14, 2002 letter to Chairman Morrissey, Mr. Reilly explained that "[p]rior to January [2002], when I was removed from these committees by the Mayor's office, I took great pride and accomplishment in preparing for these events." (Exhibit 2).

---

[1] Sandy Larusso also supported John Picard in the 2001 Democratic Primary election. Complaint ¶ 14. Mayor Borer also carried out his threat against her by cutting her position from the 2002-03 Budget. Complaint ¶ 14. Ms. Larusso has also filed a lawsuit against Mayor Borer as a result of the termination of her employment. (Exhibit 3, Reilly Dep. Tr. at 113)

The defendant does not contend that the City Council was responsible for preventing him from either getting the positions to which he sought to bump or from removing him from the Committees.

There is a question of fact as to whether retaliation by the Mayor was a substantive factor which led to these adverse employment actions and, therefore, summary judgment should be denied.

### B. THE PLAINTIFF WITHDRAWS HIS § 1983 CLAIMS AGAINST MAYOR BORER IN HIS INDIVIDUAL CAPACITY.

An action can be maintained against both an individual in his official capacity and a government entity. In Monell v. Dep't of Social Services of the City of New York, 436 U.S. 658, 690 (1978), the Supreme Court noted:

> Since official-capacity suits generally represent only another way of pleading an action against an entity of which an office is an agent…our holding today that local governments can be sued under § 1983 necessarily decides that local government officials sued in their official capacities are 'persons' under § 1983 necessarily decides that local government officials sued in their official capacities are 'persons' under § 1983 in those cases in which, as here, a local government would be sueable in its own name. Id.

The defendant contends that the plaintiff's individual § 1983 claims should be dismissed against Mayor Borer because: (1) the claims are duplicative of the claims against the City of West Haven and (2) Mayor Borer is shielded from liability by legislative immunity. Although the plaintiff does not necessarily agree with either the defendant's conclusion or its reasoning, the plaintiff will withdraw his individual § 1983 claims against Mayor Borer.

### C. SUMMARY JUDGMENT IS INAPPROPRIATE ON COUNT ONE OF PLAINTIFF'S COMPLAINT BECAUSE PLAINTIFF, FOR PURPOSES OF A SUMMARY JUDGMENT MOTION, PROPERLY ALLEGED A CLAIM UNDER CONN. GEN. STAT. § 31-51q.

In order to plead a violation of Conn. Gen. Stat. § 31-51q, the plaintiff must allege: "(1) that [he] was exercising rights protected by the First Amendment to the United States Constitution or by an equivalent provision of the Connecticut constitution;

10

(2) that [he] was fired on account of [his] exercise of such rights' and (3) that [his] exercise of First Amendment or equivalent state constitutional rights did not substantially or materially interfere with [his] bona fide job performance or [his] working relationship with [his] employer." Downing v. West Haven Board of Education, 162 F. Supp.2d 19, 33 (D. Conn. 2001).

**(a)    Plaintiff's speech involves a matter of "public concern" under § 31-51q.**

It is well established in Connecticut law that § 31-51q protects employees who make statements which constitute a matter of public concern. Brown v. New London Day, 2002 WL 1271232 (Conn. Super. May 30, 2002) (citing Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 778 (1999). In Connick v. Meyers, 461 U.S. 138 (1983), the United States Supreme Court explained that "speech that addresses a matter of public concern involves statements that can be fairly considered as relating to any matter of political, social, or other concern to the community...." Id. at 146.

Defendant cites two cases for the blanket assertion that "speech or conduct aimed to further one's own political candidacy is a matter of self-interest rather than one of public concern." Def. Mem. Of Law at 13-14. However, in Hellstrom v. Dep't of Veteran Affairs, 178 F. Supp. 2d 164 (N.D.N.Y. 2001), which the defendant relies upon, the court stated "[t]here is no question that, in certain circumstances, comments about an individual's qualifications for a highly visible position can constitute speech about a matter of public concern to which First Amendment protection will attach." Id. at 168. Hellstrom held, however, that the plaintiff made his statements (i.e., criticizing the Director's personnel decisions, accusing him of political favoritism, and attacking his qualifications) in his role as employee – not in his role as private citizen. Id. at 168.

In Sierra v. State of Connecticut, 2003 WL 22413679 (Conn. Super. Ct. Oct. 14, 2003), the plaintiff was an executive assistant to the State of Connecticut Comptroller, Nancy Wyman. The plaintiff decided to run for treasurer of the City of Hartford and took an unpaid leave of absence. During a televised primary, the plaintiff failed to respond to an anti-Semitic slur made by a Puerto Rican caller. When plaintiff was confronted about her failure to respond, the plaintiff said that she and Ms. Wyman sometimes made jokes about the Puerto Rican community. Ms. Wyman denied that she ever made jokes about

11

the Puerto Rican community. The Connecticut media severely criticized the plaintiff's actions. Three days after the plaintiff lost the city primary, she was terminated. The plaintiff claimed that her terminated was in violation of Conn. Gen. Stat. § 31-51q because she was discharged from state employment for exercising her constitutional right of freedom of speech. The Sierra court observed that an employer's speech raises a matter of public concern if the speech can "fairly be considered as relating to any matter of political, social, and other concerns in the community...." Id. at 9-10 (quoting DiMartino v. Richins, 263 Conn. 639, 667 (2003)). However, Sierra also observed that the court can look into the employee's reason for publicly discussing the matter. According to Sierra "the test is whether the employee spoke as a citizen upon matters of public concern or, instead, as an employee upon matters of personal interest." Id. at *11. The court held that the plaintiff's motive in this case was not to discuss the genuine public policy issue of bias in the Comptroller's office but was intended to further her own candidacy for state treasurer and defend herself for failing to respond to a caller's Anti-Semitic slur.

    Hellstrom and Sierra stand for the principal that comments made by a public employee during a potential campaign will not immunize the employee against disciplinary action. However, the cases do not stand for the principle, as the defendant apparently believes, that, as a matter of law, running for a public office is always a matter of self-interest rather than a political one and, therefore, has no constitutional protection. Courts have repeatedly held that public employees running for public office are engaging in a matter of public concern which warrants protection under the First Amendment. See Green v. Philadelphia Housing Authority, 105 F. 3d 882, 885-86 (3d Cir. 1997); Bass v. Richards, 308 F. 3d 1081, 1088-89 (10th Cir. 2002); Brady v. Fort Brad County, 145 F. 3d 691, 706-07 (5th Cir. 1998); Gardetto vs. Mason, 100 F. 3d 803, 812 (10th Cir. 1996).

    Mr. Reilly's decision to run for City Council on a ticket against the current Mayor in a primary was protected by the Federal and Connecticut state constitution. There is a question of fact as to whether his act was for personal or political reasons. Therefore, the defendant's argument that his claim should be dismissed because he was motivated solely by personal concerns should be rejected.

**(b)     This court can exercise supplemental jurisdiction over Plaintiff's state law claim, even if Plaintiff's federal claims do not survive summary judgment.**

Even if this court grants summary judgment on Plaintiff's federal claims, 28 U.S.C. § 1367(c)(3) gives the courts discretionary authority to retain jurisdiction over pendent state law claims. As a general rule, "the district courts may, at its discretion, exercise supplemental jurisdiction over state law claims even where it has dismissed all claims over which it had original jurisdiction, [even though] it cannot exercise supplemental jurisdiction unless there is first a proper basis for original federal jurisdiction." Parker v. Della Rocco, 252 F.3d 663, 666 (2d Cir. 2001)(quoting Norwalk v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1187 (2d Cir. 1996)).

In Cates v. State of Connecticut, 2000 U.S. Dist. LEXIS 21110 (D. Conn.), the defendants argued that the court should decline to decide the plaintiff's state law claim for intentional infliction of emotional distress due to the "unsettle nature of the law in this area." Id. at *47 (relying on Koehler v. Chesebrough-Ponds, Inc., 705 F. Supp. 721, 724-25 (D. Conn. 1988)). Cates concluded, however, that 'because the court has subject matter jurisdiction over the plaintiff's Title VII and 1983 claims, and because the surviving state law claims arise from the same nucleus of operative facts, the court, in its discretion, will retain jurisdiction over the remaining state law claims in the interests of judicial economy." Id. at *48.

The court, in its discretion, should retain jurisdiction over Plaintiff's state law claims if Plaintiff's federal claims are dismissed on this motion for summary judgment.

**(c)     Conn. Gen. Stat. §31-51q does not require that the wrongdoer have final policymaking authority.**

Both Conn. Gen. Stat. § 31-51q and § 1983 impose similar substantive tests to establish a prima facie case of unlawful retaliation. To assert a valid claim under § 31-51q, the plaintiff must show: "(1) that [plaintiff] engaged in protected speech, (2) that [plaintiff] was disciplined or fired because of that speech, and (3) that such speech did not substantially or materially interfere with [plaintiff's] bona fide job performance or with [plaintiff's] working relationship with [plaintiff's] employer." Downing v. West Haven Board of Ed., 162 F. Supp. 2d 19, 33 (D. Conn. 2001).

Similarly, to prevail under a § 1983 retaliation claim the plaintiff must demonstrate: "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a casual connection between the protected activity and the adverse employment action." Id. at 29.

In Downing, the court stated that since the plaintiff's § 31-51q claim was similar to her retaliation claim under § 1983 the court would be "guided by [its] analysis of the section 1983 retaliation claim." Id. at 33. The court applied the same analysis for both claims.

The defendants' in this case, however, took Downing's analysis a step further and engrafted onto Conn. Gen Stat. §31-51q a requirement that does not exist. Def. Mem. Of Law at 15-16. The defendants claim that, because the substantive analysis is identical in both §31-51 and § 1983 claims, the plaintiff must prove wrongdoing on the part of a final policymaker in order to assert liability under §31-51q. Def. Mem. Of Law at 16.

The United States Supreme Court has repeatedly held that a municipality may only be held liable under §1983 if the conduct that caused the constitutional violation was undertaken pursuant to a municipality's policy or custom. See Monell v. Dep't of Social Services, 426 U.S. 658 (1978). Courts have refined § 1983 liability to allow municipal officials who have "final policymaking authority" to subject the government to liability. See Jeffes v. Barnes, 208 F.3d 49, 57 (2000).

Despite the defendants' contention, however, the constitutional principals that apply in a §1983 analysis are not present under Conn. Gen. Stat. § 31-51q. The defendants do not cite even one case where the court required the plaintiff in the case under Conn. Gen. Stat. §31-51q to show that the wrongdoer was the final policymaker.[2]

Even if defendants assertion was correct, which it is not, summary judgment is not appropriate because the plaintiff has conceded that the City Council is the final policymaker for purposes of § 1983 liability and the City Council's ratification of Mayor Borer's budget subjects the City to liability.[3]

**(d)    The doctrine of legislative immunity does not bar a claim against Mayor Borer in his individual capacity under Conn. Gen. Stat. §31-51q.**

---

[2] After extensive research, the plaintiff has not found a single case that supports the defendants' contention that a plaintiff must show that the wrongdoer is the final policymaker.
[3] See Section II(A)(a) of Plaintiff's Opposition Brief.

The defendants contend that "municipal legislators are entitled to absolute immunity from civil liability for their legislative activities." Def. Mem. Of Law at 16. The defendants rely on the United States Supreme Court's decision in Bogan v. Scott Harris, 523 U.S. 44, 52 (1998) to support this general statement. However, in Bogan, the Court held, "state and regional legislators are entitled to absolute immunity from liability under §1983 for their legislative activities." Id. at 49. The court did not hold that such absolute immunity applies to § 31-51q claims.

The defendants do not cite to a single case where the court found legislative immunity in a §31-51q claim.[4] The defendants assertion that the plaintiff's § 31-51q claims are barred by the doctrine of legislative immunity merritless. Therefore, summary judgment should be denied.

## V.    CONCLUSION

For all the foregoing reasons, the plaintiff requests that the court deny the defendants' motion for summary judgment.

                                              THE PLAINTIFF,
                                              THOMAS REILLY

                                              By_____
                                              Gary Phelan (CT 03670)
                                              Tammy Marzigliano (CT 23326)
                                              Outten & Golden LLP
                                              Four Landmark Square
                                              Suite 201
                                              Stamford, CT  06901
                                              (203) 363-7888

---

[4] After substantial research, the plaintiff has not found any cases which granted an individual defendant legislative immunity in a §31-51q case.

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was mailed, first-class, postage prepaid on July 1, 2004 to:

        Jennifer L. Schancupp, Esq.
        Susman, Duffy & Segaloff, P.C.
        55 Whitney Avenue
        PO Box 1684
        New Haven, CT  06507

        Michael P. Farrell, Esq.
        201 Center Street
        West Haven, CT 06516

                              _____
                              Gary Phelan