DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

45

1    Newspaper articles I believe that
2 were printed; any letters that I had from the mayor.
3  Appointments.  Any appointments that the mayor gave
4 me.

5    I believe that's it.  I'm not sure of
6 anything else at this point.

7    MS. SCHANCUPP:  Off the record.

8    (Discussion held off the record.)

9    Turning now to the allegation of Paragraph
10 19 in the complaint, you claim that the defendant
11 repeatedly altered the requirements of every
12 position that you sought to bump into in order for
13 you not to qualify.

14    What do you mean by that?

15    A    Well, there were certain jobs that were
16 available that were never posted and give me the
17 opportunity to bump into and also a job that I --
18 jobs that I did post, bid for, I was told that I
19 didn't qualify because of their interpretation of
20 the union contract.

21    Q    Which positions did you seek to bump into?

22    A    Highway superintendent.

23    Q    Is that the position that Mr. Cavallaro
24 filled?

POST REPORTING SERVICE
HAMDEN, CT  (800) 262-4102

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1     A     Eventually, yes.

2     Q   . What other jobs?

3     A     Assistant to the public works director and

4     I believe procurement office, risk manager.

5     Q     When you sought to bump into highway

6     superintendent, what did you do?

7     A     Sent a letter to Ralph DeLucca, personnel

8     director.

9     Q     And what happened next?

10    A     I was disqualified.

11    Q     Were any reasons given for your

12    disqualification?

13    A     Yes.

14    Q     What were they?

15    A     That the city didn't agree with my

16    interpretation of the contract and that the

17    superintendent paid more than the electrical

18    inspector.

19                    MS. SCHANCUPP:  Off the record.

20                    (Discussion held off the record.)

21                    MS. SCHANCUPP:  Mark that.

22                    (Whereupon, a letter to Mr. Reilly

23    from Mr. DeLucca was marked as Defendant's Exhibit

24    No. 2 for Identification.)

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1       Q    Mr. Reilly, I'm showing you now a document

2    that's been marked as Defendant's Exhibit 2.   Can

3    you please take a moment to review that document?

4                      Have you had an opportunity to review

5    it?

6       A    Yes, I have.

7       Q    Can you identify that document?

8       A    It's a facsimile to a letter I received

9    back from Mr. DeLucca, personnel director, denying

10   me the right to bump into the position of

11   maintenance superintendent.

12      Q    Earlier you testified as to the reasons

13   why you were not allowed to bump into the position

14   of highway superintendent.

15                    Is the reasons that the city

16   communicated to you -- are they in that letter?

17      A    Yes.

18      Q    Was there any other communication other

19   than that letter to you regarding reasons why you

20   were not able to bump into the position of highway

21   superintendent?

22      A    Not that I recall.

23      Q    One thing that this letter states as per

24   the union contract, Article 14, Section 1, all bumps

1    must be a lateral or lower classification.  I

2    believe a "to" is missing there.

3                    Is that your understanding of the

4    union contract?

5        A    Yes.

6        Q    So you would agree with this statement

7    that the union contract requires that all bumps must

8    be to a lateral or lower classification?

9        A    Yes.

10       Q    Is it your contention that the position of

11   highway superintendent was not to a lateral or lower

12   classification then the position of electrical

13   inspector?

14       A    It was my belief that it was a lower

15   classification then electrical inspector.

16       Q    Why is that?

17       A    Because we are hourly employees and I was

18   paid a higher hourly salary then the highway

19   superintendent.

20       Q    When you say you were paid a higher hourly

21   salary as electrical inspector then the highway

22   superintendent, your job as electrical inspector was

23   that salaried or hourly?

24       A    Hourly.

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1       Q     What were you paid per hour?

2       A     I believe --

3       Q     In the last year that you were employed?

4       A     It was 25 or $26 an hour.

5       Q     And the position of highway superintendent
6 is that hourly or salaried?

7       A     Same, same as mine, hourly.

8       Q     Do you know what the hourly pay was when
9 you sought to bump into it?

10      A     It was less than mine.  It was like 50 or
11 60 cents an hour less than mine.

12      Q     You mentioned that you also sought to bump
13 into the position of assistant to public works.  How
14 did you do that, same thing; it was posted?

15      A     Same thing.  No, it was not posted.

16      Q     How did you learn of that position being
17 open or that position being one that you thought you
18 could bump into?

19      A     The assistant to the public works director
20 retired; took an early retirement program.

21      Q     Was that early retirement program one that
22 was offered in the same budget during which the
23 position of electrical inspector was eliminated?

24      A     Yes, it was.

50

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1       Q    So it's the 2002 budget, is that correct,
2   2002-2003?
3       A    2002-2003, yes.
4       Q    So when that budget was proposed or put in
5   place, am I correct in saying that certain positions
6   were eliminated and certain people or certain
7   positions were eligible for early retirement?
8       A    Yes.
9       Q    So the assistant to the public works
10  commissioner took early retirement and that position
11  was vacant?
12      A    Yes.
13      Q    How did you make your desire to bump into
14  that position though?
15      A    I applied to the personnel director.
16      Q    That was Mr. DeLucca?
17      A    Yes.
18      Q    Was that in writing?
19      A    Yes.
20      Q    I take it you were subsequently informed
21  that you couldn't bump into that position?
22      A    Yes.
23      Q    How were you informed?
24      A    I'm not sure if I got a written notice or

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1     Mr. DeLucca verbally told me.

2        Q    If you had received a written notice, it

3    would be one of the documents that you would have

4    turned over to your attorneys?

5        A    Yes, it would have.

6        Q    Okay.  Do you recall what the reasons

7    were?

8              Well, I take it it was Mr. DeLucca

9    who informed you that you weren't eligible to bump

10   into that position?

11       A    Yes.

12       Q    Do you recall what the reasons were that

13   you were given?

14       A    Yes, I do.

15       Q    What were they?

16       A    Mr. DeLucca said you can't bump into a

17   vacant position.

18       Q    What did you understand that to mean?

19       A    It was his decision that you couldn't bump

20   into a vacant position.

21       Q    Do you have any knowledge as to how a

22   vacant position gets filled, if it's not via

23   bumping?

24       A    To the best of my knowledge, the position

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1    is filled after an interview with Mr. DeLucca and a

2    person is hired.

3        Q    Once you were informed that you couldn't

4    bump into a vacant position, did you have the option

5    of informing Mr. DeLucca that you wanted to go

6    through that process, interviewing with him and

7    seeking to obtain the position assistant to public

8    works?

9        A    I believe I did.

10       Q    Do you know if that was in writing or if

11   that was --

12       A    If I did, it would have been in writing.

13       Q    If there's no written record of it?

14       A    I don't know.  I can't answer that because

15   there was a position at some time, during the

16   changes, that I did not get a chance.  I was away

17   when the position was open and filled before I got

18   back.

19            I don't know which position it was.

20       Q    When you say there was a position, a

21   position for assistant to public works?

22       A    No, a position that opened up in 1103.

23       Q    What position was that?

24       A    It could have been highway superintendent,

1    it could have been park maintenance.  There were

2    several positions in the last two years that have

3    opened up and I tried to submit my name in every

4    position that was opened up.

5              I know I did miss one posting.

6    Q    So you're saying that you submitted your

7    name for all posted vacant positions?

8    A    To the best of my knowledge, every posted

9    position that was posted I put in an application for

10    that position.

11    Q    From, say, June of 2002 forward?

12    A    Yes.

13    Q    To the best of your knowledge what have

14    those positions been, how many of them?

15    A    There was three or four.  Highway

16    superintendent, assistant to the commissioner, park

17    maintenance and I believe superintendent of

18    operations.

19    Q    When you say that you submitted your name

20    for all of these four-posted positions, to the best

21    of your recollection, did you seek to bump into

22    these positions?

23    A    Some positions were a bump, others were

24    bid.

54

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1    Q    Which positions were you a bump, in your

2    understanding?

3    A    Superintendent of highway and assistant to

4    the public works director.

5    Q    And the other two, park maintenance and

6    superintendent of operations, those were a bid

7    versus a bump on your part?

8    A    Quite possibly.  Superintendent of

9    operations might have been a bid.  I'm not sure.

10    Q    Park maintenance was what?

11    A    Park maintenance, that would have been a

12    bid I believe.  I believe that person had too much

13    seniority.

14    Q    What do you mean by that?

15    A    The person that held that position had a

16    lot more seniority, so I could not bump him, so I

17    believe it was a bid.

18         If a person holds a position that's

19    senior to me, I cannot bump him.  If I applied for

20    that, it would have been a posted position I

21    believe.

22    Q    But wouldn't the position need to be

23    vacant in order for it to be posted?

24    A    Yes, but I don't understand your question.

1          MS. SCHANCUPP:  Off the record.

2          (Discussion held off the record.)

3          (Recess)

4          (Whereupon, Defendant's Exhibits 3

5     through 16 were marked for Identification at this

6     point.)

7          Q     Before we took a break, Mr. Reilly, and we

8     went off the record, you were explaining to me the

9     difference between bidding on a vacant job versus

10    bumping into a position and my understanding is that

11    you would seek to bump into a position which was

12    occupied by another member of 1103 and a bid would

13    be on a position which was posted because it was

14    vacant; is that correct?

15         A     That's correct.

16         Q     When you say you believe that you bid on

17    the position of park maintenance and on the position

18    of superintendent of operations, at the time you bid

19    on those, those would have been vacant positions; is

20    that correct?

21         A     If it was posted, it was a bid.

22              (Whereupon, a document headed City of

23    West Haven, Department of Labor Relations &

24    Personnel, Bumping Policy, Ralph DeLucca, was

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1      identified as Defendant's Exhibit No. 3 for

2      Identification.)

3          Q    I'm showing you now a document that's been

4      marked as Defendant's Exhibit 3.  Why don't you take

5      a moment to review that document?

6                     Have you had an opportunity to review

7      that document?

8          A    Yes, I have.

9          Q    Can you identify that document?

10         A    No.

11         Q    That's a document that you provided to

12     your attorneys, correct?

13         A    Yes.  I believe so, yes.

14         Q    Do you recall how you obtained a copy of

15     that document?

16         A    No.

17         Q    Just so the record's clear, it's a

18     document that's got City of West Haven letterhead,

19     Department of Labor Relations & Personnel and it's

20     entitled Bumping Policy and it's got I guess Ralph

21     DeLucca's name in the upper right-hand corner?

22         A    Yes.

23         Q    Do you know whether or not Mr. DeLucca

24     gave you a copy of that document?

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1    Q    Was anybody else present, other than you

2  and Mr. DeLucca, during that conversation?

3    A    No.

4    Q    And your conversation with Mr. Cavallaro

5  did that occur during the same time frame?

6    A    Yes, it was in the same time frame.

7    Q    Was anybody else present during that

8  conversation?

9    A    Not that I recall.

10    Q    One thing that you state in this letter to

11  Mr. DeLucca, which is marked as Defendant's Exhibit

12  6, is that I guess in a parenthetical in Paragraph

13  Three that the City contends that the position of

14  electrical inspector is salaried versus hourly.

15             What's your understanding of that?

16    A    My understanding, that's how the city sees

17  it.  I don't agree with the city.

18    Q    When you say that's how the city sees it,

19  what's the basis for that understanding?

20    A    That was Ralph DeLucca's decision.  It was

21  never, has never been tried before or has never been

22  brought up before to the best of my knowledge.

23    Q    When you say that's not how you see it,

24  why is that?  Why do you view it as an hourly versus

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1    a salaried position?

2         A    Because I get paid by the hour.  If I

3    don't come to work, I don't get paid.  I'm forced to

4    punch a time clock and keep track of my time by

5    hours.

6              If I work over, I get compensatory

7    time or overtime.

8         Q    So is it correct then that you would view

9    a salaried position as just a straight salary?

10        A    I would be guaranteed 35 hours a week pay

11   no matter what, yes.

12        Q    So say a salary is 45,000, you would get

13   it regardless of whether or not --

14        A    If I was sick, I would still get paid

15   that, yes.

16        Q    That's your understanding of salaried

17   versus hourly?

18        A    Yes.

19        Q    You also make a statement in this letter

20   that there's no savings associated with the

21   elimination of the position of electrical inspector.

22              Explain that to me?

23        A    The difference between my job and the

24   assistant building official was approximately $800.

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1    The city hired an assistant building official on a
2    per diem, paying him more.
3                There was no savings.  They could not
4    handle the workload, once they eliminated my
5    position.
6       Q    Well, your position was eliminated
7    effective July 1 of 2002, is that correct?
8       A    Yes.
9       Q    Because that's the fiscal year, is July to
10   June?
11      A    July.
12      Q    So the budget that gets adopted is for
13   July 1 to June 30, correct?
14      A    Yes.  I would do the same exact work as an
15   ABO, except for signing permits.  I would receive
16   applications for permits, I would guide the people
17   through the process and the only thing lacking was
18   the signature and I would bring it to Mr. Gladwin
19   and he would ask what my comments were.
20               Once I told him, he would agree and
21   sign the permit.
22      Q    So you're saying that as an electrical
23   inspector you functioned outside the discipline of
24   electrical?

DEPOSITION OF THOMAS REILLY    65
JANUARY 15, 2004

1       A    Absolutely.

2       Q    Now as an electrical inspector, that

3  position is set forth in Connecticut General

4  Statutes, is that correct?

5       A    Electrical inspector?

6       Q    Yes.

7       A    Yes.

8       Q    Do you know whether or not, by statute,

9  the electrical inspector can function outside of the

10  discipline of electrical?

11      A    I do now.

12      Q    What's your knowledge?

13      A    My knowledge now is that, no, you're not

14  supposed to.

15      Q    When you say that you functioned outside

16  the discipline of electrical, while you held the

17  position of electrical inspector, how often did that

18  occur?

19      A    Daily.

20      Q    Did you ever have any conversations with

21  anyone in the building department or anyone else?

22                            Did you ever have any concerns

23  about that?

24      A    No.

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1       Q    Did you ever have any conversations with

2    anybody about why it is that you were going beyond

3    the electrical inspections and doing other types of

4    inspections?

5       A    No.  I thought routine.

6       Q    When you say you functioned outside the

7    discipline of electrical, were you able to issue a

8    plumbing permit?

9       A    No.

10       Q    Were you able to issue a building permit?

11       A    No.

12       Q    Were you able to issue a construction

13    permit?

14       A    No.

15       Q    Were you able to issue a mechanical

16    permit?

17       A    No.

18       Q    Did you ever issue any of those?

19       A    No, I did not.

20       Q    So the only permits that you issued as

21    electrical inspector were electrical permits?

22       A    Yes.

23       Q    One of the claims that you make in this

24    letter, in the Third Paragraph, is that the

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1       personnel office is orchestrating the bumping

2       process.

3                   What do you mean by that?

4           A     They're in charge of it.  They're the

5       person that -- the people that I would have to deal

6       with and they would make the decisions.

7           Q     Did you believe that the bumping process

8       ought to be orchestrated by somebody other than

9       personnel?

10          A     Yes.

11          Q     What was your belief or understanding as

12      to who ought to orchestrate the bumping process,

13      other than personnel?

14          A     I thought personnel and a member of 1103,

15      the union rep, should be involved.

16          Q     Do you know whether or not 1103 was

17      involved at all in your efforts to bump into certain

18      positions?

19          A     No, I do not.

20          Q     You currently hold the position of

21      property maintenance code inspector?

22          A     I do.

23          Q     What are the duties of that position?

24          A     We enforce the 1993 BOCA property and

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

68

1    maintenance codes.

2        Q    Is that a lateral position to the position

3    of electrical inspector?

4        A    It's a lower paying job.

5        Q    In terms of duties is it lateral?

6        A    It's not professional, there's no license

7    needed.

8            (Whereupon, Defendant's Exhibit No. 7

9    for Identification was identified.)

10       Q    Let me show you Defendant's Exhibit 7 and

11   ask you to identify that.

12           Have you had an opportunity to review

13   that?

14       A    Yes, I have.

15       Q    Can you identify that?

16       A    Today's the first time I ever saw it.

17           (Whereupon, a job posting for 1103

18   dated July 23, 2002, for risk manager-procurement

19   was identified as Defendant's Exhibit No. 8 for

20   Identification.)

21   BY MS. SCHANCUPP:

22       Q    I'm going to show you Defendant's Exhibit

23   8 and ask you to review that for a moment, please.

24           Have you had an opportunity to review

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

69

1    that?

2       A    Yes, I have.

3       Q    Can you identify that document?

4       A    This is a job posting for 1103.

5       Q    For which position?

6       A    Risk manager-procurement.

7       Q    And the date on that?

8       A    July 23rd, 2002.

9       Q    Did you bid on that position?

10      A    I believe I did, yes.

11      Q    If the date on that is July 23rd, '02, am I

12   correct in assuming that you had already bumped into

13   the position of property maintenance code inspector

14   at the time you bid on the position of risk

15   procurement manager?

16      A    Absolutely.

17      Q    After you bid on that position -- well,

18   how did you go about bidding on that position?

19      A    I would have applied to the personnel

20   department as normal practice, in writing.

21      Q    After you applied to personnel, did

22   anything further transpire with respect to your bid

23   for the position of risk procurement manager?

24      A    No.

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1    Q    Did you have any conversations with Mr.

2    DeLucca or anybody else in personnel about the bid

3    for that position?

4    A    I don't recall any at this time.

5    Q    Do you recall any conversations with

6    anybody within the city about the bid on that

7    position?

8    A    No, I do not.

9    Q    I take it the bid for that position was

10   not successful?

11   A    No, I didn't get the job.

12   Q    Do you know why that was?

13   A    They don't tell you anything.

14   Q    When you say they, personnel?

15   A    Personnel never tells you that you're

16   rejected or they just give it away and you see the

17   next person in the job.

18   Q    So the general course of things is you

19   would make your application, via written

20   application, and then if you're the candidate you

21   would interview I take it?

22   A    Yes.

23   Q    But if you're not a candidate you wouldn't

24   be notified that your application isn't going any

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1      further?

2          A    There's no set rule in the City of West

3      Haven.  They don't practice one thing.  Sometimes

4      you're interviewed; sometimes you're not given an

5      interview but you're never told that -- very seldom

6      are you told you're not qualified or not getting the

7      job.

8          Q    The way you find out is, as you said, if

9      you see somebody else showing up for that position?

10         A    Yes.

11         Q    Is this position currently occupied, risk

12     procurement manager?

13         A    Yes.

14         Q    Who holds that?

15         A    Carol Silverstein.

16         Q    Showing you now Defendant's Exhibits 10

17     and 11, I'm going to ask you to take a look at

18     those, please.

19              Have you had an opportunity to review

20     those?

21         A    Yes, I have.

22         Q    Let me backtrack, actually, for a moment.

23              On document 8, or the document that's

24     been identified as Defendant's 8, the position

1    that's posted is risk procurement manager.

2              One of the allegations that you make

3    in your complaint or one of the facts I guess

4    recited in your complaint is that Sandy Lorusso

5    served as the City of West Haven's risk manager.

6              Is the position of risk procurement

7    manager something other than the position of risk

8    manager, to your knowledge?

9         A    To my knowledge, yes.

10        Q    To your knowledge how do they differ?

11        A    They combine two jobs.

12        Q    So there was, I guess, prior to July of

13   2002, there was a separate procurement manager job

14   and a separate risk manager job?

15        A    I believe so but I didn't know if they

16   called it procurement manager or assistant

17   purchasing agent at the time.

18        Q    But there were two people fulfilling those

19   functions and the position that's posted there is a

20   combination of those two positions?

21        A    Yes.

22        Q    Do you know who held the procurement job?

23        A    I believe Carol.

24        Q    The person who ultimately --

73
DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1        A    -- became the risk manager.

2                    (Whereupon, a job posting for 1103

3        for the position of assistant building official

4        dated January 6, 2003, was identified as Defendant's

5        Exhibit No. 10 for Identification.)

6                    (Whereupon, a disqualification letter

7        from Mr. Gladwin to Mr. Reilly was identified as

8        Defendant's Exhibit No. 11 for Identification.)

9        Q    Going back to 10 and 11, can you identify

10       Defendant's 10 for me?

11       A    Number 10 is the job posting for 1103 for

12       the position of assistant building official.

13       Q    And the date of that?

14       A    The date was January 6, 2003.

15       Q    And the document marked as 11; can you

16       identify that?

17       A    Yes.

18       Q    What is it?

19       A    It's a letter from Mr. Gladwin saying that

20       he had interviewed me and he found me disqualified.

21       Q    What's the basis for the disqualification?

22       A    That I did not hold the license at that

23       present time for assistant building official.

24       Q    And that's correct, isn't it?  As of

74

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1      January '03, you did not hold the ABO license?

2          A    At that time, yes.

3          Q    One of the requirements or qualifications

4      for the posted position was that you must meet

5      eligibility requirements and licensure requirements

6      for building or assistant building official, as

7      prescribed by Connecticut State Statutes, was it

8      not?

9          A    Yes, and I was.

10         Q    How is that?

11         A    I met the requirements for the licensing.

12     That's what it asks for.

13         Q    So it's your contention that you met the

14     eligibility requirements even though you didn't have

15     the license?

16         A    Yes, I do, and the same statement put into

17     the job title for property maintenance code

18     enforcement.

19         Q    Meaning the same statement, you must meet

20     the eligibility requirements and licensure

21     requirements for building or assistant building

22     official, as prescribed by Connecticut General

23     Statutes or State Statute?

24         A    Yes.

75

DEPOSITION OF THOMAS REILLY
JANUARY 15, 2004

1    Q    So it's your belief that holding the ABO

2    license was not a requirement or was not a

3    qualification for the position of ABO for the City

4    of West Haven at the time you applied for that

5    position?

6    A    Not the posting that the City of West

7    Haven put out.

8    Q    Did you have any conversations with Mr.

9    DeLucca or Mr. Gladwin about the need to hold the

10   ABO license in order to hold the ABO position?

11   A    Yes.

12   Q    What were those conversations?

13   A    The conversation was in the interview Mr.

14   Gladwin gave me for the position and he said

15   according to State Statute that I was not qualified

16   to be an ABO.

17   Q    Is it your understanding that that

18   statement of Mr. Gladwin is correct?

19   A    Yes, I do.

20            MS. SCHANCUPP:  Off the record.

21            (Discussion held off the record.)

22            (Luncheon recess.)

23            (Whereupon, a letter dated April 14,

24   2002, to Mr. Morrissey from Mr. Reilly was

POST REPORTING SERVICE
HAMDEN, CT   (800) 262-4102